UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
TAHA ELBASIR, <u>et</u> <u>al.</u>,                   )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )        Civil Action No. 04-1706 (PLF)
                                        )
KINGDOM OF SAUDI ARABIA,                )
                                        )
              Defendant.                )
_____)


<u>OPINION</u>

       This matter is before the Court on defendant's motion to dismiss for lack of

subject matter and personal jurisdiction under Rule 12(b)(1) and (2) of the Federal Rules of Civil

Procedure.  Plaintiffs have brought suit seeking damages for defendant Kingdom of Saudi

Arabia's alleged breach of two agreements to provide plaintiffs with financial assistance for

medical treatment and other expenses.  The Kingdom of Saudi Arabia asserts that it is a

sovereign nation immune from suit in the courts of this country under the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 <u>et seq.</u>  It further asserts that this Court does not

have personal jurisdiction over it.  Upon consideration of the motion, the opposition, the reply,

and the entire record in this case, the Court will deny defendant's motion without prejudice.


I.  BACKGROUND

       Plaintiffs are Taha Elbasir, his wife Saadia Mohamed Ibrahim, and their minor

children.  <u>See</u> Complaint ("Compl.") at 1.  Mr. Elbasir and his family are Sudanese citizens who

formerly lived in Saudi Arabia.  <u>See</u> <u>id</u>. ¶¶ 13, 14;  <u>see</u> <u>also</u> Plaintiff's Opposition to Defendant's

Motion to Dismiss ("Opp.") at 1.  While living and working in Saudi Arabia, Mr. Elbasir was

injured in an automobile accident on October 7, 1999.  See Compl. ¶¶ 3, 4;  Opp. at 1.  Plaintiffs

allege that the teenage driver of the car that injured Mr. Elbasir is a "member of the Royal

Family."  Compl. ¶ 5.  Mr. Elbasir suffered traumatic brain injury and was apparently comatose

for a period of time.  Compare id. ¶ 4 (Mr. Elbasir was "unconscious for 2 months") with Opp. at

1 (Mr. Elbasir was "in a coma for over six months").

Following his injury, Mr. Elbasir received medical treatment in Saudi Arabia.  See

Motion to Dismiss for Lack of Subject Matter and Personal Jurisdiction ("Mot.") Ex. 2,

Declaration of Dr. Mohammed A. Al-Sekait  ("Al-Sekait Decl.") ¶ 6 (describing Mr. Elbasir's

treatment history based on Elbasir's medical records).   Plaintiffs allege that the government of

Saudi Arabia promised to "pay all [Mr. Elbasir's] medical expenses and take care of the family

until [he] is able to return to work" in exchange for the family not prosecuting the driver of the

car.  See Compl. ¶ 5.  They further claim that this agreement was made in writing by Prince

Abdulaziz bin Fahad bin Abdulaziz Al-Saud, but that the document reflecting the agreement was

taken away from defendant's wife, Ms. Ibrahim, before the family left Saudi Arabia.  See Opp.

Ex. 3, Declaration of Sadia [sic] Ibrahim ("Ibrahim Decl.") ¶¶ 3, 4.  Defendant counters that Mr.

Elbasir's treatment was provided as part of Saudi Arabia's national health care system, and not

pursuant to any agreement between plaintiffs and the Kingdom of Saudi Arabia.  See Mot. at

12-16;  Al-Sekait Decl. ¶ 3 (stating that, at the time of Mr. Elbasir's accident, Saudi Arabia's

health care plan provided care for resident workers and their families).  Defendant does not

address or refute assertions respecting the alleged agreement between plaintiffs and Prince

Abdulaziz bin Fahad bin Abdulaziz Al-Saud beyond the bare statement by Dr. Mohammed Al-

2

Sekait, Director of the Saudi Embassy's Medical Supervision Division, in a sworn declaration that he does not have personal knowledge of such a promise.  <u>See</u> Al-Sekait Decl. ¶ 18.  From Dr. Al-Sekait's declaration it is clear, however, that he was not personally involved with Mr. Elbasir's treatment in Saudi Arabia;  the declaration does not purport to represent that such an agreement was not reached.

        After Mr. Elbasir was discharged from the hospital in Riyadh, Saudi Arabia where he was initially treated for his injuries, he was given further treatment at a rehabilitation hospital in Jeddah, Saudi Arabia.  <u>See</u> Al-Sekait Decl. ¶ 6.  On October 5, 2000, plaintiffs applied to the Saudi Patient Division of the Center for Research and Study ("the Center") for monetary assistance to pursue additional medical rehabilitation treatment beyond the care he received in the Saudi hospitals.  <u>See id</u>. ¶ 7.  The Center is run by Prince Abdulaziz bin Fahd bin Abdulaziz Al-Saud and provides assistance to those who require care not available in the Saudi Arabian health care system who cannot afford to pay for it themselves.  <u>See id</u>. ¶ 3.  The Center granted Mr. Elbasir's request for additional treatment, and he, his wife, and their three young children came to Washington D.C., where Mr. Elbasir was admitted for inpatient treatment to the National Rehabilitation Hospital ("NRH") on April 4, 2002.  <u>See id</u>. ¶¶ 7, 9;  <u>see also</u> Compl. ¶¶ 7, 8. While in the United States, Mr. Elbasir's treatment was overseen by Dr. Al-Sekait as the Director of the Saudi Arabian Embassy's Medical Supervision Division.  <u>See</u> Al-Sekait Decl. ¶¶ 4, 5; <u>see also</u> Compl. ¶ 12.

        As a result of his treatment at the NRH, Mr. Elbasir's condition improved.  <u>See</u> Compl. ¶ 8;  <u>see also</u> Mot. Ex. 1E, Sept. 17, 2002 Examiner's Report on Taha Ali Al-Baseer [sic] ("Examiner's Report").   As a result of Mr. Elbasir's improved condition, on July 9, 2002 NRH

doctors recommended to Dr. Al-Sekait that Mr. Elbasir be discharged to out-patient care.  See

Mot. Ex.1B, July 18, 2002 Letter from Wendy Baynard, Director, NRH International, Telehealth

and Volunteer Programs to Dr. Mohammed Al-Sekait ("Baynard Letter");  Al-Sekait Decl. ¶ 10.

On July 10, 2002, the NRH unsuccessfully attempted to discharge Mr. Elbasir.  See Examiner's

Letter;  Al-Sekait Decl. ¶¶ 11, 12.  Mr. Elbasir's wife, Ms. Ibrahim, apparently refused to allow

him to leave in-patient care and was uncooperative with NRH staff.  See Examiner's Report; see

also Al-Sekait Decl. ¶ 11.  Because of these problems with Mr. Elbasir's wife and the

undesirable impact it had on Mr. Elbasir's behavior, the NRH suggested to Dr. Al-Sekait that Mr.

Elbasir's wife and their children return to Sudan, and that Mr. Elbasir remain at the NRH only

through the end of July for a scheduled ear surgery.  See Baynard Letter at 2;  Al-Sekait Decl.

¶ 11.

        At some point between July 18, 2002 and August 13, 2002, the NRH again

attempted to move Mr. Elbasir and his family from in-patient accommodations to a temporary

room in the hospital, as part of a plan to eventually move plaintiffs to the NRH's guest

accommodation facilities.  See Mot. Ex. 1C, August 14, 2002 letter from Todd Bernstein,

Medical Director, NRH International Program to Dr. Mohammed Al-Sekait ("Bernstein Letter").

Again plaintiffs refused to cooperate.  As the NRH prepared to move plaintiffs to a different floor

within the hospital, Mr. Elbasir's wife left the hospital and refused to disclose her whereabouts to

NRH staff, forcing the hospital to keep Mr. Elbasir in in-patient treatment for safety reasons.  See

Al-Sekait Decl. ¶ 12;  Examiner's Report;  Bernstein Letter.  Ms. Ibrahim stated that the attempt

to move her husband from outpatient treatment violated her agreement with Prince Abdulaziz bin

Fahad bin Abdulaziz Al-Saud.  Ibrahim Decl. ¶¶ 8-9.  She further stated that defendant was

already in violation of its agreement with her because it did not provide her or her children with

accommodations, as it does for most Saudi citizens.  Id. ¶¶ 10-12.

       The hospital terminated Mr. Elbasir's therapy on August 13, 2002 and provided

Mr. Elbasir with "medical care only."  See Examiner's Report;  Mot. Ex. 1D, August 20, 2002

letter from Dr. Andrew McCarthy to Dr. Al-Sekait.[1]  On August 14, 2002, the hospital requested

Dr. Al-Sekait's assistance in dealing with the Mr. Elbasir and Ms. Ibrahim.  See Bernstein Letter.

On August 15, 2002, Dr. Al-Sekait notified plaintiffs that the Center was terminating its

sponsorship of Mr. Elbasir's treatment in the United States.  See Al-Sekait Decl. ¶ 13.

       Ms. Ibrahim continued to refuse to cooperate in the NRH's plan to discharge her

husband.  See Examiner's Report.  Pursuant to the NRH's request, Maher H. Hanania (who is

also plaintiff's counsel in this matter) was appointed Mr. Elbasir's guardian by the Superior

Court of the District of Columbia on October 1, 2002.  See Compl. ¶ 11. On October 25, 2002,

the NRH was granted a temporary restraining order by the Superior Court, enjoining Mr. Elbasir

from occupying NRH premises after October 28, 2002.  See Mot. Ex. 1A, District of Columbia

Superior Court Temporary Restraining Order.

       After the issuance of the temporary restraining order, Mr. Elbasir's guardian Mr.

Hanania "looked to the government of Saudi Arabia to provide [the Elbasir family with] the

means" to continue to pay for outpatient treatment and living expenses.  See Opp. at 3.  Plaintiffs

allege that Mr. Hanania contacted the Saudi Arabian embassy and spoke with Dr. Al-Sekait.  See

id.  Plaintiffs claim that Dr. Al-Sekait "informed the guardian that if [the guardian] took

---

[1]     When Mr. Elbasir began "rapidly losing the gains he made," the NRH "reinstated
minimal therapy in an attempt to maintain functional status and health."  Examiner's Report.

[p]laintiffs out of the hospital[, Dr. Al-Sekait] would continue financial assistance for the

family's expenses and out-patient treatment." Compl. ¶ 16.  Plaintiffs maintain that they have

incurred various non-medical expenses in reliance on Dr. Al-Sekait's assurances that defendant

would continue financial assistance to the family, including leasing an apartment at a cost of over

$15,000, buying furniture costing $4,700, and $15,000 in personal expenditures.  Id. ¶¶ 17-19;

see also Ibrahim Decl. ¶ 28 (stating that as of June 27, 2005, plaintiffs had borrowed

approximately $50,000 based on Dr. Al-Sekait's alleged assurances).

## II.   DISCUSSION

### A.   Personal Jurisdiction

Defendant has moved to dismiss on two bases:  lack of personal jurisdiction and

lack of subject matter jurisdiction.  The arguments the defendant advances in its motion relate

solely to the assertion of sovereign immunity without explicit reference to whether such

immunity presents a challenge to personal or subject matter jurisdiction.  Defendant's argument

for dismissal under the FSIA on grounds that the defendant is immune from suit is properly the

subject of a motion to dismiss for lack of subject matter jurisdiction.  See Republic of Austria v.

Altmann, 541 U.S. 677, 691 (2004) (subject matter jurisdiction exists in the federal courts of the

United States under the FSIA only if one of the exceptions to sovereign immunity applies);

Kirkham v. Societe Air France, 429 F.3d 288, 291 (D.C. Cir. 2005) ("[P]arties seeking FSIA

immunity do so through Rule 12(b)(1) motions to dismiss for lack of subject matter

jurisdiction.").  The Court therefore will deny defendant's motion to dismiss for lack of personal

jurisdiction and address defendant's arguments relating to sovereign immunity as an issue of subject matter jurisdiction.

### B.   Subject Matter Jurisdiction

#### 1.   FSIA Legal Standards

The Foreign Sovereign Immunities Act is "the sole basis for obtaining jurisdiction over a foreign state in our courts." Republic of Austria v. Altmann, 541 U.S. at 699 (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).  Federal district courts have exclusive jurisdiction over civil actions against a foreign state, regardless of the amount in controversy, provided that the foreign state is not entitled to immunity under the FSIA.  See 28 U.S.C. §§ 1330, 1604; Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. at 434-35.  A foreign state is presumed to be immune from suit, 28 U.S.C. § 1604, and is in fact immune, unless one or more of the exceptions to immunity enumerated in the FSIA apply. See 28 U.S.C. §§ 1605-1607; Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993);  Acree v. Republic of Iraq, 370 F.3d 41, 44 (D.C. Cir. 2004).  "'At the threshold of every action in a district court against a foreign state, . . . the court must satisfy itself that one of the exceptions applies,' as 'subject-matter jurisdiction in any such action depends' on that application." Republic of Austria v. Altmann, 541 U.S. at 691 (quoting Verlinden v. B.V. v. Central Bank of Nigeria, 461 U.S. 480, 493-94 (1983)).

Once a defendant presents a prima facie case that it is a foreign sovereign, plaintiffs "bear[] the burden of producing evidence to show that immunity should not be granted." FG Hemisphere Assocs. v. Democratic Republic of Congo, 447 F.3d 835, 842 (D.C.

Cir. 2006).  "[T]he defendant [then] bears the burden of proving that the plaintiff's allegations

do not bring the case within a statutory exception to immunity."  See Phoenix Consulting v.

Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).  In attempting to meet this burden, "the

defendant may challenge either the legal sufficiency or the factual underpinning of an exception."

Id.  "If the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations,

the court should accept the plaintiff's factual allegations as true and determine whether such facts

bring the case within any of the exceptions to foreign-state immunity invoked by the plaintiff."

Peterson v. Royal Kingdom of Saudi Arabia, 332 F. Supp.2d 189, 195 (D.D.C. 2004) (citing

Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d at 449);  see Kilburn v. Socialist

People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1127 (D.C. Cir. 2004).  "Where the defendant

has [] challenged the factual basis of the court's jurisdiction, the court may not deny the motion

to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the

defendant."  Phoenix Consulting v. Republic of Angola, 216 F.3d at 40.  Rather, the Court "must

go beyond the pleadings and resolve any disputed issues of fact the resolution of which is

necessary to a ruling upon the motion to dismiss."  Id. (citations omitted).  In going beyond the

pleadings to resolve such a dispute, courts "retain[] 'considerable latitude in devising the

procedures . . . to ferret out the facts pertinent to jurisdiction.'"  Id. (citing Prakash v. American

Univ., 727 F.2d 1174, 1179-80 (D.C. Cir. 1984)).

### 2.  Commercial Activity Exception

Defendant argues that because none of the FSIA exceptions applies to the claims

brought by plaintiffs, it is immune from suit as a foreign sovereign and this case therefore must

be dismissed.  The only FSIA exception that arguably applies in this case is the "commercial

activity" exception.  See 28 U.S.C. § 1605(a)(2);  see also Mot. at 10;  Opp. at 4.  The FSIA's

"commercial activity" exception waives sovereign immunity where

> the action is based upon a commercial activity carried on in the
> United States by the foreign state; or upon an act performed in the
> United States in connection with a commercial activity of the
> foreign state elsewhere; or upon an act outside the territory of the
> foreign state elsewhere and that act causes a direct effect in the
> United States.

28 U.S.C. § 1605(a)(2).   The term "commercial activity" is defined under the Act as a "regular

course of commercial conduct or a particular commercial transaction or act."  28 U.S.C.

§ 1603(d);  see Daliberti v. Republic of Iraq, 97 F. Supp.2d 38, 46 (D.D.C. 2000).  "The

commercial character of an activity shall be determined by reference to the nature of the course

of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C.

§ 1603(d).  "The key inquiry in determining whether particular conduct constitutes commercial

activity is not to ask whether its purpose is to obtain money, but rather whether it is 'the sort of

action by which private parties can engage in commerce.'"  Mwani v. Bin Laden, 417 F.3d 1, 17

(D.C. Cir. 2005) (quoting Saudi Arabia v. Nelson, 507 U.S. at 362).  See also Republic of

Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992);  Daliberti v. Republic of Iraq, 97 F.

Supp.2d at 47.

          The "commercial activity" exception of the FSIA does not encompass the

"administrat[ion] of a government program to provide for the health and welfare of [a

sovereign's] citizens and residents."  Jungquist v. Sheikh Sultan Bin Khalifa Al Nayhan, 115 F.

3d 1020, 1030 (D.C. Cir. 1997).  Provision of such health care benefits - including the provision

of medical treatment - are "uniquely sovereign in nature . . . ." Id.  Thus, any agreement between

the defendant and plaintiffs relating to Mr. Elbasir's medical treatment under the Saudi health

care system does not fall within the "commercial activity" exception of the FSIA.  Defendant has

provided uncontradicted evidence to support its contention that the Saudi government's provision

for Mr. Elbasir's medical care and related expenses for him personally were administered

pursuant to the government's health care program.  See Al-Sekait Decl. ¶¶ 6-8, 13, 15, 17, 18.

Insofar as the cost of Mr. Elbasir's medical care and any attendant expenses were provided as

part of a government health care program, the Court agrees with defendant that plaintiffs' claim

therefore must fail.

       Independent of Mr. Elbasir's expenses related to his medical care, however, is the

issue of financial assistance for housing and other expenses to Mr. Elbasir's family, which

plaintiffs allege they were promised by the defendant.   Altogether, plaintiffs allege that there

were three separate agreements between themselves and the defendant, all three of which involve

promises to assist not only Mr. Elbasir, but also his family.  With respect to the first agreement,

plaintiffs assert that the defendant agreed to provide not only for Mr. Elbasir's medical treatment,

but also his family's expenses until he was well enough to work in exchange for his family not

prosecuting the driver of the car that injured him.  See Compl. ¶ 5;  Ibrahim Decl. ¶ 3.  With

respect to the second agreement, plaintiffs allege that defendant agreed to provide for the entire

family's travel to the United States for Mr. Elbasir's treatment.  See Compl. ¶ 6.  With respect to

the third agreement, plaintiffs allege that in exchange for their cooperation with the removal of

Mr. Elbasir from the National Rehabilitation Hospital, Dr. Al-Sekait agreed not only to continue

financial assistance for Mr. Elbasir's medical treatment, but also to continue to assist his family

with its living expenses.  See Compl. ¶ 16;  see also Ibrahim Decl. ¶¶ 3, 18;  Opp. Ex. 2,

Declaration of Ishaq Bashir ("Bashir Decl.") ¶ 7.  Relying on this third agreement, plaintiffs

further allege that they have incurred certain non-medical expenses totalling approximately

$50,000.  Compl. ¶¶ 17-19;  Ibrahim Decl. ¶ 28.  Plaintiffs allege that the first and third of these

agreements were breached.[2]  Defendant has failed to address this component of the alleged

agreements in its motion or in the declarations or other evidence provided in support of its

motion.  The Court therefore is unable to grant the motion to dismiss with respect to any of the

financial assistance allegedly promised to Mr. Elbasir's family.


3.   Questions Remaining

Given this legal framework, the Court is faced with several questions of fact and

of mixed law and fact.  First, the Court must determine whether any of the alleged promises to

plaintiffs regarding financial assistance to Mr. Elbasir's family were made at all.  Second, if such

promises were made, the Court must determine whether any of them was done in the promisor's

personal capacity or in his capacity as a sovereign representative.[3]  If the Court determines that

any of the alleged agreements were in fact entered into, it must then determine whether such an

agreement between the Kingdom of Saudi Arabia and the plaintiffs falls under the FSIA's

"commercial activity" exception.  See 28 U.S.C. § 1605(a)(2).  As previously stated, if the

assistance promised was within the aegis of a government health or welfare benefit program, then

---

[2]      The second agreement was, by implication, fulfilled when plaintiffs were brought
to the United States for Mr. Elbasir's treatment.

[3]      A corollary issue raised by defendant in its motion with respect to the alleged
agreement between plaintiffs and Dr. Al-Sekait is what authority -- actual or otherwise -- a
particular sovereign representative has to make such a promise or enter such an agreement.

the agreements do not fall within that exception.  Jungquist v. Sheikh Sultan Bin Khalifa Al Nayhan, 115 F. 3d at 1030.

Defendant disputes whether it or its agents ever entered into any of these alleged agreements, but it does not provide any evidence (declarations or other documentary evidence) that would permit the Court to make such a determination on the record before it.  In his sworn declaration, Dr. Al-Sekait denies that the third agreement was reached -- that is, that Dr. Al-Sekait made a promise on behalf of the Kingdom of Saudi Arabia to the plaintiffs to provide continued assistance in return for plaintiffs' agreement to remove Mr. Elbasir from the NRH. Al-Sekait Decl. ¶ 17.  As to the first agreement, the only evidence defendant presents to dispute its existence is Dr. Al-Sekait's statement that he is not personally aware of it.  Id. ¶ 18.  In light of the sworn declaration from Mr. Elbasir's wife attesting to all three alleged agreements, and the sworn declaration from a translator attesting to the third alleged agreement, the Court is presented with a "disputed issue[] of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  See Phoenix Consulting v. Republic of Angola, 216 F.3d at 40 (citations omitted).

The Court would not need to reach the question of whether the parties entered into these agreements and whether such agreements were commercial in nature if defendant had demonstrated that any of the alleged financial assistance that was or could have been provided to Mr. Elbasir's family, such as hotel accommodations, the cost of an aprtment and funiture, and other expenses, was or would have been provided pursuant to the medical benefits program or any other government benefit program administered by the defendant.  Compare Jungquist v. Sheikh Sultan Bin Khalifa Al Nayhan, 115 F. 3d at 1027 (government of Abu Dhabi explicitly

contended that "all of the [medical] treatment *and related assistance*" provided, which included a housing and subsistence allowance for plaintiff and her mother, was "within the scope of the Abu Dhabi government's official medical treatment program") (emphasis added).  It is not clear whether the assistance allegedly promised or provided to Mr. Elbasir's family was within the scope of the program that provided Mr. Elbasir personally with financial assistance for medical and related expenses.

Dr. Al-Sekait's declaration does not help in clarifying this matter.  In his declaration, Dr. Al-Sekait is explicit in only one instance that the financial assistance provided to Mr. Elbasir's family and not to Mr. Elbasir himself was provided pursuant to the government health care program administered by the Center, and that is with respect to the second alleged agreement to provide plaintiffs with support to travel to the United States.  See Al-Sekait Decl. ¶ 7.  Since plaintiffs do not allege a breach of this agreement, it is not at issue.  All other references to the provision of or possible provision of financial assistance to Mr. Elbasir's family in Dr. Al-Sekait's declaration are at best oblique.  See Al-Sekait Decl. ¶¶ 3 ("For certain patients whose applications for assistance are approved, the Center will fund the costs associated with travel to the United States for treatment, and expenses incurred in the United States related to such care.");  8 ("Saudi Arabia sponsored Mr. Elbasir and his family for tourist visas to the United States so that he could receive medical treatment"); 13 ("On August 15, 2002, I notified Mr. Elbasir and his family that the Center had decided to terminate *his* sponsorship for further treatment in the United States.") (emphasis added);  15 ("On August 30, 2002, I informed Mr. Elbasir that the Center had terminated *his* sponsorship for additional treatment in the United

States, and offered to arrange for *his* transportation, along with an appropriate medical escort, to his home in Sudan.") (emphasis added).

        Ms. Ibrahim's declaration seems to suggest that accommodations may be provided on a routine basis to the family's of medical patients, perhaps pursuant to a government program: "Most Saudi citizens when they arrive for medical treatment, they are provided with hotels such as Holiday Inn for the family."  Ibrahim Decl. ¶ 10.  Nowhere, however, does the record contain any competent evidence upon which the Court could make a determination on the mixed question of law and fact of whether the assistance provided or allegedly promised to Mr. Elbasir's family would have been provided pursuant to a Saudi government benefits program.  If the defendant can provide such evidence, the Court would not have to deal with the purely factual issue -- more dependant on resolving matters of witness credibility -- of whether the alleged agreements or promises were ever made at all.

## III.  CONCLUSION

        For the foregoing reasons, the Court concludes that defendant's argument that it is immune from suit as a sovereign nation is properly a challenge to the Court's subject matter, not its personal, jurisdiction.  The Court further concludes that while it lacks subject matter jurisdiction over the Kingdom of Saudi Arabia for acts undertaken by defendant in Saudi Arabia and the United States in connection with its government-run health care system, and the attendant benefits provided to plaintiffs under that system, it must deny the motion to dismiss without prejudice at this time.

In view of the possibility that the parties may be able to address and clarify some of the questions raised in this Opinion, the Court will permit the defendant to file, if appropriate, a renewed motion to dismiss containing declarations or other evidence addressing the questions discussed above concerning the nature of the financial assistance provided to Mr. Elbasir's family, and whether such assistance was provided pursuant to a government benefits program.  If such a renewed motion is not, in defendant's view, capable of resolving such questions, or if the further evidence provided in conjunction with briefing of the new motion is not sufficient to resolve this issue,  the Court will permit limited jurisdictional discovery on (a) whether such promises were made or such agreements were entered, and (b) the nature of the alleged agreements in order to determine whether any part of them fall within the FSIA's commercial activity exception.  The Court therefore denies defendant's motion to dismiss without prejudice.

An Order consistent with this Opinion shall be issued this same day.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  January 4, 2007